[Cite as *Morton v. Pyles*, 2012-Ohio-5343.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| DOROTHY MORTON, | ) | CASE NO.  11 MA 124 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| RONALD PYLES, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Common Pleas Court, Case No. 11CV638.

JUDGMENT: Judgment Reversed; Protection Order Vacated.

APPEARANCES:
For Plaintiff-Appellee: Attorney Anthony Siciliano
1045 Tiffany South, Suite 2
Youngstown, Ohio  44514

For Defendant-Appellant: Attorney David Gerchak
P.O. Box 2985
Youngstown, Ohio  44511

JUDGES:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated:  November 14, 2012

VUKOVICH, J.

{¶1} Defendant-appellant Ronald Pyles appeals from a judgment of the Mahoning County Common Pleas Court granting a civil stalking protection order sought by Dorothy Morton, guardian of the person of Olivia Hartman, to prevent Pyles from contacting Hartman. Pyles argues that the evidence produced does not warrant the issuance of a civil protection order. For the reasons discussed below, given the record before us, we find that the trial court abused its discretion in granting the civil protection order. Thus, the trial court's decision is reversed and the protection order is vacated.

STATEMENT OF THE CASE

{¶2} Olivia Hartman, a twenty-year old female, was living at Victory Harvest Ministries, which is a church, and attending Mahoning County Career and Technical Center. Ronald Pyles is the pastor at Victory Harvest and lives there with his wife. In the beginning of 2011 (either January or February), Hartman told a teacher at her school that she and the pastor shared a "bad secret." She also indicated that if anyone found out the secret, the pastor would have to leave the church. Tr. 13. The School notified Mahoning County Board of Developmental Disabilities (MCBDD), which came and removed Hartman from Victory Harvest. This occurred in February 2011. Hartman was then placed in the care of Anna Robinson, a licensed independent provider/adult care provider. Guardianship proceedings were then initiated in Mahoning County Common Pleas Court. Morton was appointed guardian over Hartman's person.

{¶3} On March 1, 2011, Morton filed a Petition for Civil Stalking Protection Order or Civil Sexually Oriented Offense Protection Order on behalf of Hartman against Pyles. The petition alleged that there was a suspicion of sexual abuse and that numerous phone calls between Pyles and Hartman had occurred and those phone calls left Hartman physically and emotionally upset.

{¶4} A full hearing was held on the matter on April 20, 2011. Hartman, Morton, Robinson and Pyles testified at the hearing. Following the testimony, the magistrate issued a Civil Stalking Protection Order; it did not issue a Civil Sexually

Oriented Offense Protection order.  05/05/11 Decision.  Pyles objected to the magistrate's decision; Morton responded to those objections.

**{¶5}**  The trial court approved the magistrate's decision and stated:

The Court finds by a preponderance of the evidence that the Respondent has knowingly engaged in a pattern of conduct that caused Petitioner to believe that the Respondent will cause physical harm or cause or has caused mental distress; and the following orders are equitable, fair and necessary to protect the persons named in this Order from stalking offenses.

07/20/11 J.E.

**{¶6}**  Pyles timely appeals that order.

<u>Assignment of Error</u>

**{¶7}**  "The Court erred in adopting the report and recommendation of the magistrate."

**{¶8}**  The decision whether to grant a civil protection order lies within the sound discretion of the trial court.  *Olenik v. Huff,* 5th Dist. No. 02–COA–058, 2003–Ohio–4621, ¶ 21.  Our standard of review for whether the protection order should have been granted, and thus, whether the elements of menacing by stalking were established by the preponderance of the evidence, entails a manifest weight of the evidence review.  *Caban v. Ransome,* 7th Dist. No. 08MA36, 2009-Ohio-1034, ¶ 7. The Ohio Supreme Court has recently explained that the manifest weight of the evidence standard set forth in *Thompkins*, a criminal case, also applies in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-23. As was explained in *Thompkins*:

"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The

discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶9}** However, in weighing the evidence, "the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21.

**{¶10}** Thus, with that standard in mind, we turn to the elements of a civil stalking protection order.

**{¶11}** R.C. 2903.214 governs civil stalking protection orders. It states:

(C) A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member, by filing a petition with the court. The petition shall contain or state all of the following:

(1) An allegation that the respondent is eighteen years of age or older and engaged in a violation of section 2903.211 of the Revised Code against the person to be protected by the protection order or committed a sexually oriented offense against the person to be protected by the protection order, including a description of the nature and extent of the violation.

R.C. 2903.214(C)(1).

**{¶12}** As aforementioned, the civil protection order was granted on the basis of menacing by stalking, R.C. 2903.211. It was not based on the commission of a sexually oriented offense. R.C. 2903.11 provides:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause

physical harm to the other person or cause mental distress to the other person.

R.C. 2903.211.

**{¶13}** As used in R.C. 2903.211, a pattern of conduct means "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). That subsection does not require that a pattern of conduct be proven by events from two different days. *Halton v. Crossley*, 5th Dist. Nos. 11CA10 and 11CA11, 2012-Ohio-550, ¶ 42. Rather, a pattern of conduct could arise out of two or more events occurring on the same date, provided that there are sufficient intervals between them. *Id.* citing *State v. Scruggs*, 136 Ohio App.3d 631, 634, 737 N.E.2d 574, 576 (2d Dist.2000). The statute does not define the term "closely related in time," but case law suggests that the evidence should be considered in context, i.e. it is a case by case determination. *Halton.*

**{¶14}** As to the element of mental distress, the statute indicates that it means either of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2)(a)-(b).

**{¶15}** Mere mental stress or annoyance does not constitute mental distress for purposes of the menacing by stalking statute. *Caban,* 7th Dist. No. 08MA36, 2009–Ohio–1034, ¶ 29. The statute does not, however, require proof that the victim sought or received treatment for mental distress. *Retterer v. Little*, 3d Dist. No. 9-11-23, 2012-Ohio-131, ¶ 41, citing *State v. Szloh,* 189 Ohio App.3d 13, 2010–Ohio–3777, 937 N.E.2d 168, ¶ 27 (2d Dist.). Nor does the statute require that the mental distress be totally or permanently incapacitating or debilitating, rather it merely has to

be substantial. *Retterer*, citing *Lias v. Beekman,* 10th Dist. No. 06AP–1134, 2007–Ohio–5737, at ¶ 16. Incapacity has been determined to be substantial if it has a significant impact upon the victim's daily life. *Retterer*, quoting *State v. Horsley,* 10th Dist. No. 05AP–350, 2006–Ohio–1208, ¶ 48. Evidence of changed routine can support a finding of mental distress. *Retterer*, citing *Smith v. Wunsch,* 162 Ohio App.3d 21, 2005–Ohio–3498, 832 N.E.2d 757, at ¶ 20, citing *Noah v. Brillhart,* 9th Dist. No. 02CA0050, 2003–Ohio–2421, ¶ 16, and *State v. Scott,* 9th Dist. No. 20834, 2002–Ohio–3199, ¶ 14. The Third Appellate District has determined that testimony that the offender's conduct caused the victim considerable fear and anxiety can also support a finding of mental distress under R.C. 2903.211. *Retterer*.

{¶16} The testimony from Hartman's caregiver, Anna Robinson, was that when Hartman first came to live with her, Hartman cried a lot. Tr. 37. Robinson stated that Hartman was on the phone almost constantly with Pyles for the first three days. Robinson stated that when Hartman's phone died Hartman became combative and verbally abusive. Tr. 38, 45. Robinson indicated after about a week Hartman's behavior improved and she now is happy, enjoys going places with Robinson and interacts with Robinson. Tr. 41-42, 48. However, Robinson testified that whenever there are visits with Pyles, Hartman is always "difficult to deal with" afterwards and it is "horrible." Tr. 39. Specifically, for the first couple of hours there is a lot of crying and great effort has to be expended to calm Hartman down. Tr. 39.

{¶17} Pyles even testified that when Hartman was on the phone with him, she was hysterical during those first couple of days after she was taken to live with Robinson. Tr. 64. He admitted that he talked to her often during the first few days she began living with Robinson.

{¶18} Hartman also testified at the hearing. She discussed how she would talk to Pyles when she was first removed from Victory Harvest. Tr. 11. She explained that she would cry when she was finished talking to him because she missed him. Tr. 12. She also stated that she wants to go back and live at Victory Harvest. Tr. 31.

**{¶19}** As can be seen, there are two or more instances of contact, through telephone calls, that caused Hartman to be hysterical. Also, it can be seen that Pyles acted knowingly since he admitted the contact and admitted that Hartman was hysterical. However, it is his position that mental distress is not shown and that if it was it is not from his contact, but rather from her being kept from him and his church.

**{¶20}** Given the record in this case, we agree with Pyles that the evidence provided does not demonstrate the requisite level of mental distress to warrant a protection order. The testimony is clear that Hartman wants to have contact with Pyles; she wants to see him and communicate with him. Thus, we do not have a typical civil protection stalking order case where the person claiming to be stalked by menacing is actually testifying that she feared for her physical or mental safety or that the contact with the perpetrator caused her mental anguish.

**{¶21}** One appellate court has reversed a civil protection stalking order where the person allegedly being stalked continued to reside freely in the alleged stalker's apartment rent free and continually borrowed the alleged stalker's truck. The court recognized that even though the demeanor and attitude are very important and do not translate well on the written page, there was no evidence to establish a pattern of conduct. *Dupal v. Sommer*, 5th Dist. No. 2009CA00032, 2009-Ohio-5791, ¶ 42. That case is similar to the case at hand in that the alleged victims consent to the contact

**{¶22}** That said, the major factual difference between *Dupal* and the case at hand is the mental state of the victim in this case. The victim in *Dupal* did not have a mental disability. Conversely, Hartman has a mental disability. The record discloses that the guardianship over her person was granted because she was deemed incompetent. Incompetent, for purposes of a guardianship, means any person who is "so mentally impaired as a result of a mental or physical illness or disability, or mental retardation * * * that the person is incapable of taking proper care of the person's self or property." R.C. 2111.01(D). However, beyond this information, the record fails to disclose the extent of Hartman's disability. The testimony from Hartman's caregiver, Robinson, seems to imply that Hartman only has a slight mental disability.

{¶23} Given the limited information the record discloses about Hartman's disability, it is unclear whether her own perception that Pyles is not stalking her and not causing her mental distress is an accurate perception. It is true that, "[s]talkers engage in psychological warfare, which by its nature is devious, insidious, and subtle." *State v. Werfel,* 11th Dist. No.2006–L–163, 2007–Ohio–5198, ¶ 34. Thus, in some instances a mentally disabled person may not be able to identify the subtle psychological manipulations that a stalker would engage in, and thus, would not fear his or her physical or mental safety or realize that the contact with the perpetrator caused him or her mental anguish. That mentally disabled person might even still want to see the stalker even though that person is manipulating him or her. That said, we do not want to create a blanket holding that all mentally disabled persons who have a guardianship over their person would not be able to identify the subtle psychological manipulations that a stalker might engage in and would not fear their safety or realize their own mental anguish. Thus, in order to warrant a civil protection order there must be more in the record than the mere fact that the alleged victim has a mental disability and due to incompetence, a guardianship over his or her person has been granted. The evidence of the extent of the mental disability would be helpful to show that the mentally disabled person is unable to recognize the subtle psychological warfare of the alleged stalker.

{¶24} This is especially the case, when in situations like the one before us there is limited evidence of mental distress. As stated above, mental stress does not constitute mental distress. A change in routine has been stated to constitute a showing of mental distress. However, a change of routine suggests going to work a different route to avoid contact with the stalker or to change a lunch time or exercise time. That type of change was not testified to in this case. Rather, there was an attempt to show a change of behavior from when there was contact and when there was no contact. For instance, Hartman's caregiver, Anna Robinson, testified that when there is contact between Hartman and Pyles, whether by telephone or visit, Hartman is "difficult to deal with" afterwards and there is a lot of crying. Tr. 38-39 45. However, when there is no contact Hartman's behavior improves and she seems

happy and interacts well with Robinson.  Tr. 41-42, 48. While this testimony does show a change in behavior, it is not enough, given the record, to show mental distress.  We are unable to determine whether Pyles is causing her mental distress or whether Hartman is merely missing Pyles and that is what is causing her change in behavior.  The inability to determine this partially stems from limited information in the record regarding Hartman's mental disability.

{¶25} For the foregoing reasons, we find that the trial court abused its discretion in granting the request for a civil protection based on menacing by stalking. Therefore, the judgment of the trial court is hereby reversed and the protection order is vacated.

Waite, P.J., concurs.
DeGenaro, J., dissents.